**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 26-1291
_____

STANFORD WILLIAMS

v.

SUPERINTENDENT FAYETTE SCI;
DISTRICT ATTORNEY OF ALLEGHENY COUNTY;
ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA,
                    Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:19-cv-00141)
District Court Judge: J. Nicholas Ranjan
_____

Argued June 30, 2026
_____

Before: SHWARTZ, PHIPPS, and BOVE, Circuit Judges.

(Filed: July 23, 2026)
_____

# OPINION
_____

Ashley N. Oravetz [ARGUED]
Ronald M. Wabby, Jr.
Allegheny County Office of District Attorney
436 Grant Street
Pittsburgh, PA 15219

Counsel for Appellants

Connor J. Baer [ARGUED]
Joseph W. Ferari
James A. Mazzone
Jones Day
500 Grant Street
Suite 4500
Pittsburgh, PA 15219

Counsel for Appellee

SHWARTZ, Circuit Judge.

The Superintendent Fayette SCI, the District Attorney of Allegheny County, and the Attorney General of Pennsylvania (collectively, "the Commonwealth") appeal the District Court's order granting Stanford Williams's petition for a writ of habeas corpus and ordering his release. Applying the required deference to the state court's finding that Williams moved for a mistrial, we conclude that (1) Williams did not present clear and convincing evidence that the state court erred in making that finding and consequently concluding that his

2

third trial did not violate the Double Jeopardy clause; and (2) his counsel at the third trial was not constitutionally ineffective for failing to raise a double jeopardy argument that the state court later found meritless and that we reject on habeas review. Therefore, we will reverse.

I

A

Williams has been tried three times for the 1993 murder of Omar Massey. Among the evidence used against Williams was the presence of gun residue on his hands after the murder. At the first trial, his counsel, John Elash, introduced a stipulation that a man named John Faingnaert would have testified that the day before the murder, he "assisted Mr. Williams with the cleaning and test-firing of his deer rifle" at a gun range. App. 46-47. The stipulation provided an alternative explanation for the gun residue found on Williams's hands after the murder, namely that Williams could have been exposed to gun residue while cleaning his firearm. The first trial resulted in a hung jury.

During the second trial two years later, the parties informed the court that Faingnaert just told the prosecutor and a detective that "he . . . never saw [Williams] cleaning his firearm or didn't assist in the cleaning of the firearm."[1] App. 53-54.

_____

[1] At the PCRA hearing, Elash said that he thought Faingnaert changed his testimony because "he was talked to forcibly by certain members of the police force." App. 85.

3

Elash told the court that he intended to introduce testimony, either from himself or Williams's sister, about Faingnaert's account of his encounter with Williams that would refute Faingnaert's new version. Williams's sister took an affidavit from Faingnaert in 1994 and could testify that Faingnaert told her that he saw Williams at the gun range fixing his equipment. Elash said he could also testify about Faingnaert's prior account, but this would make him a witness and unable to continue representing Williams. Elash also said "my client's desires are for this trial to finish. I do not know if we can effectively waive my testimony. . . . Williams would, if he could, I believe —."[2] App. 54.

The court responded that (1) Williams's sister could not testify about what Faingnaert told her because her testimony would be hearsay, (2) the defense would have to call Faingnaert as a witness and then "would be impeaching [its] own witness," (3) even if Williams did not want Elash to testify, he could not waive an ineffective assistance of counsel ("IAC") claim based on an assertion that Elash's failure to testify deprived Williams of his opportunity to impeach Faingnaert, and (4) "[w]e're left in a situation where there is

_____

[2] After the em-dash, the court spoke. This suggests that Elash either trailed off or was interrupted by the court. It is not clear what Elash meant by "waive my testimony," but based on the trial judge's response that "[y]ou couldn't waive claim of ineffectiveness for your failure to come and testify in any subsequent impeachment of that witness," App. 54, it seems Elash was referring to Williams's waiver of an ineffective assistance of counsel ("IAC") claim in the event Elash did not testify.

4

no out in terms of the continuation of this particular trial."[3] App. 54-55. Elash responded, "I don't know what Mr. Williams wants to do," noting that he had paid for multiple attorneys and trials and may not be able to afford to litigate this case much longer. App. 55. Elash then stated "[o]bviously, I can't continue to represent him." App. 55. The trial judge asked "You're going to be a witness?" and Elash responded "I am going to be a witness. If [the prosecution] wants to supplement, that is my understanding."[4] App. 55. After explaining that the stipulation would not be admitted because Faingnaert was expected to testify inconsistently with it, the court said "Defendant's motion for a mistrial will be granted." App. 58. Immediately after that statement, the transcript reflects that "the trial was concluded." App. 58. An entry reading "Defense motion for a mistrial is hereby Granted for reasons stated on record" was placed on the docket sheet. App. 107.

At the third trial, Williams was represented by David Shrager, and he called Faingnaert as a witness. Faingnaert testified that sometime around the murder, he encountered a young man who might have been Williams at a gun range. He testified that he helped this man adjust the sight on his rifle and answered his questions about how to clean it. After Faingnaert's testimony, Shrager told the court he intended to call Elash as his next witness. The prosecution objected,

---

[3] We offer no opinion concerning whether these views are legally correct.

[4] During oral argument, both parties agreed that "supplement" referred to the potential impeachment of Faingnaert. Oral Argument at 10:35-11:50, 24:03-24:30, 27:50-29:00.

arguing that the defense would use Elash's testimony "to show that [Williams] cleaned the gun," and the court sustained the objection. App. 76. Williams was convicted and sentenced to life in prison.

Post-trial, Williams argued that the third trial violated his right to be free from double jeopardy. The trial court rejected Williams's double jeopardy claim because it concluded that Williams moved for a mistrial at the second trial. The Superior Court affirmed, holding that Williams waived his double jeopardy claim by not raising it before the third trial, and that it lacked merit in any event because, at the second trial, Williams sought the mistrial.[5]

Williams then sought relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"). During the PCRA hearing, Elash testified, among other things, that while he did not remember specifically asking the judge for a mistrial, he "kn[ew] [they] talked about it," even if just by "implication," App. 91, and that a "fair implication" of the transcript was that he wanted time to consult with Williams, App. 96. The PCRA judge, who was also the trial judge who had participated in the mistrial discussion at the second trial, heard this testimony and found that Williams requested the mistrial. The PCRA judge also found that even if Shrager had raised a double jeopardy claim at the third trial, it would have failed because the mistrial was granted at Williams's request. The Superior Court

---

[5] The Superior Court relied on the trial court's statement that "Defendant's motion for a mistrial will be granted" and the docket sheet's statement "that the mistrial was granted on Williams's motion." App. 131.

6

affirmed, agreeing that "Williams requested a mistrial." App. 164.

B

Williams then sought habeas relief in federal court under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. The District Court concluded that the third trial violated Williams's right to be free from double jeopardy and that Shrager was ineffective for failing to raise the double jeopardy claim before the third trial. Williams v. Armel, 819 F. Supp. 3d 389, 394, 402 (W.D. Pa. 2026). First, the Court concluded that neither claim was procedurally defaulted because the Government expressly waived any exhaustion defense to the standalone double jeopardy claim, and Williams raised the IAC claim "at every stage" of the proceedings. Id. at 394 (citing 28 U.S.C. § 2254(b)(3)). Second, on the merits, the District Court found that (1) Williams overcame AEDPA's presumption of factual correctness because the trial transcript was clear and convincing evidence that he did not move for a mistrial, id. at 395, (2) Williams did not consent to a mistrial, even though it also observed that "[i]t's not entirely clear" the relief Elash sought at during Williams's second trial, id. at 392, and (3) manifest necessity did not support the trial court's mistrial declaration, id. at 401-02. Therefore, the District Court granted Williams's habeas petition and ordered his release.[6] Id. at 403.

---

[6] We granted a stay pending appeal.

The Commonwealth appeals.[7]

## II[8]

### A

The Commonwealth argues that Williams (1) procedurally defaulted his standalone double jeopardy claim, (2) was not subject to double jeopardy, nor was Shrager ineffective for failing to raise double jeopardy because (a) Williams requested the mistrial at the second trial, (b) Williams impliedly consented to that mistrial, and (c) that mistrial was required by manifest necessity, and (3) did not establish IAC based on his double jeopardy claim. Applying AEDPA deference, we conclude that the state court did not err in finding that Williams moved for a mistrial at the second trial, thereby defeating his claim. Because we conclude that Williams moved for a mistrial and thus the third trial did not violate

---

[7] Fed. R. App. P. 22(b)(3) provides that a COA "is not required when a state or its representative or the United States or its representative appeals" a habeas ruling.

[8] The District Court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). "We exercise plenary review over a district court decision on a habeas petition where, as here, the District Court did not hold an evidentiary hearing." Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009); see Laird v. Sec'y, Pa. Dep't of Corr., 129 F.4th 227, 242 (3d Cir. 2025), cert. denied sub nom., Laird v. Harry, 146 S. Ct. 138 (2025) ("When a district court has not held an evidentiary hearing, as it did not here, we exercise de novo review of its habeas decisions, including its application of AEDPA.")

Williams's right to be free from double jeopardy, we need not address procedural default or whether implied consent or manifest necessity required a mistrial. See Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005) (holding it unnecessary to determine whether there was procedural default because "the claims in question lack merit").

"Comity is the backbone of federal habeas review. When states prosecute and convict people, state courts play the primary role in enforcing federal law and correcting their own mistakes." Johnson v. Mahanoy, 144 F.4th 178, 182 (3d Cir. 2025). A federal court may not grant a writ of habeas corpus when a state court has already denied the same underlying claim on the merits, unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[9] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. 28 U.S.C. § 2254(d)(1)-(2); Pitchford v. Cain, 146 S. Ct. 1345, 1351 (2026). A state court's factual determinations are presumed correct, and we defer to them unless a petitioner rebuts this presumption of correctness, which requires presenting clear and convincing evidence that a state court's factual determination was unreasonable in light of the "record evidence at the time of the state court's adjudication." Rountree v. Balicki, 640 F.3d 530,

---

[9] "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

538 (3d Cir. 2011); see 28 U.S.C. § 2254(e)(1); see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000); Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ("[A] district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.").

If this standard is difficult to meet, "that is because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011). "[F]ederal intervention imposes significant costs on state criminal justice systems. It 'disturbs the State's significant interest in repose for concluded litigation,' and undermines the States' investment in their criminal trials." Shinn v. Ramirez, 596 U.S. 366, 377 (2022) (citation omitted) (quoting Harrington, 562 U.S. at 103). The Supreme Court has repeatedly emphasized the importance of deferring to state court decisions under AEDPA, so "[w]e will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction[]' for which federal habeas relief is the remedy." Burt v. Titlow, 571 U.S. 12, 20 (2013) (alteration in original) (quoting Harrington, 562 U.S. at 102); see Dunn v. Reeves, 594 U.S. 731, 739 (2021) ("This 'wide latitude' means that federal courts can correct only 'extreme malfunctions in the state criminal justice syste[m].'" (quoting Harrington, 562 U.S. at 102, 106)); Collins v. Sec'y of Pa. Dep't of Corrs., 742 F.3d 528, 546 n.12 (3d Cir. 2014).

B

"The Double Jeopardy Clause, applied to the States through the Fourteenth Amendment, provides that no person may be tried more than once for the same offence." Currier v. Virginia, 585 U.S. 493, 498 (2018) (quotation marks omitted).

10

A mistrial does not bar retrial—and thus a retrial does not violate the Double Jeopardy Clause—if the defendant requests or consents to the mistrial, or "when there is manifest necessity to terminate the first trial." Love v. Morton, 112 F.3d 131, 136-37 (3d Cir. 1997); Kennedy, 456 U.S. at 672-73; United States v. Jorn, 400 U.S. 470, 485 (1971) (plurality opinion). Here, the state court found that Williams requested a mistrial.

Applying AEDPA deference to the state court's fact-finding, as we must, we are required to conclude that the state court correctly found Elash requested a mistrial. After all, "[AEDPA] standards require federal courts to give the 'benefit of the doubt' to merits decisions issued by the courts of the sovereign States." Klein v. Martin, 607 U.S. 213, 220 (2026) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Although he never expressly moved for a mistrial, Elash stated that he could not continue to represent Williams and sought relief so that certain evidence could be presented. More specifically, the transcript shows that the prosecution intended to introduce testimony that Faingnaert did not remember seeing Williams clean his gun the day before the murder and that Elash stated he would testify that Faingnaert told him that he helped Williams clean his gun. As a result, Elash concluded he could not "continue to represent" Williams because an attorney may not serve as a witness, Pa. R. Prof.

11

Conduct 3.7(a),[10] and stated that he was not sure whether Williams could afford a new trial.[11]  App. 55.  The fact that Elash understood the possibility of a later trial shows that he also understood the possibility of a mistrial.  In fact, at the PCRA hearing, he testified that he knew he had talked about the possibility of a mistrial with the trial court, at least by

[10] The 1998 Revised Edition of Pennsylvania's Rules of Professional Conduct (including amendments through June 1, 1998) provides: "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where . . . disqualification of the lawyer would work substantial hardship on the client" and described a balancing test to determine whether the lawyer should testify. Pennsylvania Rules of Court, Rule of Professional Conduct 3.7 (1998 Revised Ed.).

[11] It is of no moment that Williams was not present at the conversation and never consented himself because the decision to consent to a mistrial is a strategic one that rests with counsel.  See United States v. Chapman, 593 F.3d 365, 369 (4th Cir. 2010); United States v. Burke, 257 F.3d 1321, 1324 (11th Cir. 2001); Fed. R. Crim. P. 43(b)(3) ("A defendant need not be present" at a "proceeding involv[ing] only a conference or hearing on a question of law.").

12

"implication."[12]  App. 91.  The District Court is correct that it is not entirely clear the relief Elash sought, but applying the required AEDPA deference, ambiguities shall be viewed in the light supporting the state court conclusion absent clear and convincing evidence that the finding was unreasonable.  Under this view, "even if it is debatable, it is not unreasonable to conclude" that Elash's comments constituted an oral motion for a mistrial.  Wood v. Allen, 558 U.S. 290, 303 (2010).  "That [a] transcript can be read in more than one way does not—by itself—rise to the level of 'clear and convincing evidence' . . . that the state court must be deemed unreasonable in choosing one reading over another."  Rountree, 640 F.3d at 543 (deferring to state court factual findings of what may have occurred during plea negotiations with different counsel because state court based its findings on reasonable reading of transcript and petitioner's reading was "only his assertion, backed by inferences").  Because the transcript upon which the District Court relies is ambiguous, it could not constitute clear and convincing evidence that the state court made an incorrect factual finding.  Put differently, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  Wood, 558 U.S. at 301.

---

[12]  We may consider the PCRA hearing testimony because "[i]n considering a § 2254 petition, we review the "last reasoned decision" of the state courts on the petitioner's claims," Simmons, 590 F.3d at 231-32, which here is the appellate court's affirmance of denial of PCRA relief, and the factual determinations therein in view of the "record evidence at the time of the state court's adjudication," Rountree v. Balicki, 640 F.3d 530, 538 (3d Cir. 2011), which here includes the PCRA testimony.

13

Applying the required AEDPA deference to the factual finding that the defense requested the mistrial, and the transcript not providing clear and convincing evidence to the contrary, the Double Jeopardy Clause did not bar Williams's third trial. Because the double jeopardy claim lacked merit, Williams's related IAC claim necessarily fails. See, e.g., Werts, 228 F.3d at 203 ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.").

III

For the foregoing reasons, we will reverse.

14